2025 IL App (2d) 240215-U
No. 2-24-0215
Order filed July 10, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-DV-48 |
| ROZALYNN BUTLER, | ) ) ) | Honorable Bianca Camargo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:   In defendant's appeal from her conviction of interfering with the reporting of domestic violence, we hold that (1) the trial court properly admitted a recording of a 911 call, (2) the court did not err in admitting defendant's prior acts of domestic violence, (3) the court did not err in limiting defendant's cross-examination of the victims, (4) defendant was not deprived of her right to a trial before a jury comprised of a fair cross-section of the community, and (5) the State proved defendant guilty beyond a reasonable doubt of interfering with the reporting of domestic violence.

¶ 2   Following a jury trial in the circuit court of Kane County, defendant, Rozalynn Butler, was found guilty of two counts of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2020)) and a single count of interfering with the reporting of domestic violence (*id.* § 12-3.5(a)). On appeal, defendant

argues that (1) the trial court erred in admitting a recording of a 911 call into evidence, (2) the court erred in admitting evidence of prior acts of purported domestic violence, (3) the court erred in limiting her cross-examination of the alleged victims, (4) she was deprived of her right to a trial before a jury selected from a fair cross-section of the community, and (5) the State failed to prove her guilty beyond a reasonable doubt of interfering with the reporting of domestic violence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant with several counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)) against her daughter, K.S., and son, D.W. Each count alleged that defendant "grabbed, and/or struck, and/or pushed" K.S. or D.W. Defendant was also charged with one count of interfering with the reporting of domestic violence. *Id.* § 12-3.5(a). All counts were based on an incident on January 26, 2022.[1]

¶ 5      Before trial, the State filed a motion *in limine* to admit into evidence a recording of a 911 call. The motion did not identify the caller or describe the subject matter of the call. The trial court initially denied the motion, and the State moved for reconsideration. On July 27, 2023, the court entered a written order noting that it had held a hearing on the motion to reconsider. The court granted the motion, ruling that the 911 recording was admissible with the caveat that, "if testimony [was] elicited regarding a time delay between the call to a family member and the call to 911, [the ruling] shall be revisited." The record contains no verbatim transcript or other

---

[1]In the motion to amend the complaint and order, the date of May 21, 2021, was given for the alleged interference with the reporting of domestic violence, but that date appears to have been a scrivener's error.

acceptable report of the proceeding on July 27, 2023. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 6 The State also filed a motion *in limine* under section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2020)) to admit evidence of other acts of domestic violence by defendant, namely (1) an incident on March 21, 2022, when defendant allegedly "grabbed K.S. by the arm and then pulled her into the house by her throat" and (2) an incident on March 23, 2022, when defendant allegedly "snatched" K.S.'s glasses from her face and said " 'Ha Ha, you can't see.' " The trial court granted the motion.

¶ 7 On August 1, 2023, the matter proceeded to a jury trial. D.W. testified that he was 17 years old at the time of trial. While D.W. was at school on January 26, 2022, defendant texted him about his grades. Defendant had come across some of D.W.'s old grades. While at school, D.W. attempted to obtain his current grades from the school office to demonstrate to defendant that his performance had improved. After school, D.W. arrived at his home in North Aurora at about 3:30 p.m. Defendant and K.S. were there when he arrived. D.W. went into the bathroom and called his grandmother. While he was in the bathroom, defendant started banging on the door. She told D.W. to come out of the bathroom and to "give [her] all of [his] stuff." Defendant eventually walked away, and D.W. went to his room. He put his cell phone, game, and laptop in a duffle bag. He believed that defendant wanted him to turn these items over to her, but he planned to leave the house with them. He also put some clothing in a duffel bag, "just in case anything happened." While he was packing these items, defendant repeatedly demanded that D.W. give his "stuff" to her. According to D.W., defendant was "in a rage, like furious." When D.W. left his room, defendant started hitting him with a pole that supported an electric fan. D.W. sustained cuts and bruises on his hand and forearm. Defendant struck D.W. with the pole about seven times.

¶ 8    D.W. testified that his stepfather came into the room and tried to pull defendant off D.W. D.W. was able to escape the house with his bag.  Once outside, he called his grandmother and told her what had happened.  D.W. intended to also call his other grandparents to ask them to pick him up.  Before D.W. did so, his stepfather came outside to give him a ride to his grandparents' home. Before they could leave, the North Aurora police arrived and made them remain at the scene. Eventually, D.W. went to the police station and gave a statement.

¶ 9    D.W. also testified about an incident on March 21, 2022.  On that day, D.W. and K.S. refused to go with defendant when she picked them up from their schools.  Afterward, D.W. and K.S. "had to go down to the police station."  They eventually left the police station with defendant and K.S.'s father, Keith S.  On the way home, defendant told D.W. and K.S. that she would "beat our ass."  When they got home, defendant took K.S.'s glasses from her and laughed that K.S. could not see.  Fearing that he and K.S. would be beaten, and knowing that K.S. could not see, D.W. took K.S.'s left arm and tried to run with her.  Defendant then grabbed K.S.'s right arm.  Defendant and D.W. both tugged on K.S.  When Keith grabbed D.W. in turn, all four fell to the ground.  Keith got on top of D.W. and choked him.  Meanwhile, defendant "dragged [K.S.] into the house."

¶ 10    K.S. was 11 years old at the time of trial.  She testified that, when D.W. came home from school on January 26, 2022, she heard defendant yelling and saw her go into D.W.'s room. Defendant "had something in her hand."  K.S. thought it was a bat.  While in her room, K.S. used her iPad to call her great-grandmother.  After speaking with her great-grandmother for about five minutes, K.S., still in her room, called 911 from her cell phone.  The prosecutor asked K.S., "And how long from when you were *** first talking to grandma, to when you called 911, ***?"  K.S. responded, "Like three minutes."  Defendant came into K.S.'s room while she was still on a call with her great-grandmother on her iPad and a separate phone call to 911.  Defendant asked K.S. if

she was on the phone with 911. Defendant then pushed K.S. against the wall, and K.S. fell to the floor. Defendant struck K.S. with open hands while K.S. was on the floor. At that point, the 911 call was still in progress, but defendant hung up the phone.

¶ 11 Over defendant's objection, the recording of the 911 call was admitted into evidence and published to the jury. (Based on K.S.'s testimony, we identify the speakers on the recording.) The recording began with the operator asking what was going on and K.S. replying that her brother and mother were fighting. K.S. said her mother was trying to hit her brother with a bat. When the operator asked if anyone needed an ambulance, K.S. said no but that her brother "just got hit with the bat." She stated that her brother had just walked out of the house and that her stepfather was in the house. K.S. then started speaking with defendant, whose voice can be heard in the background. K.S. told defendant that "he just walked out [of] the house" and that K.S. was on the phone with her "great grandma." K.S. then said, "Mom, [D.W.] just walked out [of] the house." Defendant asked K.S., "Who the f*** you on the phone with?" Defendant then asked, "Did you just have her call the police?" A muffled female voice in the background (possibly that of K.S.'s great-grandmother, coming from K.S.'s iPad) responded, "Yeah , I told her to call 911." Defendant then asked angrily, "You called the f*** police to my house?" Defendant started yelling obscenities, and K.S. started screaming, crying, and saying that she was sorry. The call was then cut off.

¶ 12 K.S. recalled that on March 23, 2022, defendant "tried to pick [K.S.] up" from school.[2] K.S. initially did not recall what else occurred that day. However, on further questioning, she

---

[2]We note that, according to D.W.'s testimony, defendant took K.S.'s glasses during the incident on *March 21*, 2022.

testified that, while on their way back from the police station, defendant took K.S.'s glasses, laughed at her, and called her names "[l]ike the B word."

¶ 13    Testifying on her own behalf, defendant stated that she argued with D.W. on January 26, 2022, and then he left the house. She denied that she physically touched him or struck him with a pole. After D.W. left, defendant went into K.S.'s room. K.S. was on the phone. Defendant asked K.S. if she had called the police and who was on the phone. K.S. said that she was on the phone with defendant's grandmother. Defendant testified that she "asked [her] grandmother, [and] she said[ ] she [was] on the phone to call the police." Defendant then asked her grandmother, "[W]hy the hell would you call the police to my house?" Defendant hung up K.S.'s phone, believing that K.S. was speaking with defendant's grandmother. Defendant denied throwing K.S. against the wall. She also denied that she took K.S.'s glasses or hit or choked K.S. on March 21, 2022.

¶ 14    Keith S. testified that he was defendant's former husband and K.S.'s father. On March 21, 2022, he and defendant picked up D.W. and K.S. from the North Aurora police station. Keith did not believe that K.S. was wearing glasses at that time. Keith denied that defendant took K.S.'s glasses.

¶ 15    Defendant was convicted of two counts of domestic battery, one each involving K.S. and D.W., and the single count of interfering with the reporting of domestic violence.

¶ 16    The record of posttrial proceedings contains (1) a written response by the State to defendant's posttrial motion and (2) an order denying defendant's posttrial motion. However, the posttrial motion itself is absent from the record.

¶ 17    Defendant filed this timely appeal.

¶ 18                                    II. ANALYSIS

¶ 19    The State correctly notes that, because the record contains no posttrial motion—although apparently one was filed and ruled on—defendant cannot establish that she preserved for appeal all the issues she raises in this court. See *People v. Cregan*, 2014 IL 113600, ¶¶ 15-16 (generally, to preserve an issue for appeal, the defendant must raise it at trial and in a written posttrial motion—exceptions being "(1) constitutional issues that were properly raised at trial and may be raised later in a postconviction petition; (2) challenges to the sufficiency of the evidence; and (3) plain errors"). Nonetheless, the State addresses the merits of all issues defendant raises. Under the circumstances, because "forfeiture is 'an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court' " (*People v. Quezada*, 2024 IL 128805, ¶ 48 (quoting *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967))), we will review the issues defendant raises. We agree with the State that none of the issues has merit.

¶ 20    Defendant first argues that the trial court erred by admitting the recording of the January 26, 2022, 911 call. According to defendant, the recording was hearsay and was not subject to any exception to the hearsay rule. She also contends that the admission of the recording violated her right to confront the witnesses against her.

¶ 21    We first consider whether the recording was inadmissible under the hearsay rule. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, under the exception for "excited utterances," also known as "spontaneous declarations" (*People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 30), the hearsay bar does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" (Ill. R. Evid. 803(2) (eff. Jan. 25, 2023)).

¶ 22    Defendant argues that the excited utterance exception does not apply because K.S. had already spoken with her great-grandmother about the incident before calling 911. Defendant relies on *People v. Busch*, 2020 IL App (2d) 180229. In *Busch*, we observed that, "[f]or a statement to be admissible as an excited utterance, three factors must be present: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) an absence of time to fabricate, and (3) a statement relating to the circumstances of the occurrence." *Id.* ¶ 41. We further noted that "[a]n intervening discussion between an occurrence and a statement a party seeks to admit as an excited utterance destroys the spontaneity of the statement and might cause the declarant to reflect on the statement, moving it outside the realm of the excited utterance exception." *Id.* However, in *People v. Williams*, 193 Ill. 2d 306, 353 (2000), cited by the State, our supreme court explained that "a declarant may make a spontaneous declaration to a person even after having spoken previously to another." Thus, under *Williams*, whether an intervening discussion destroyed the spontaneity of a statement is a case-by-case inquiry. The trial court's admission of evidence is reviewed for an abuse of discretion. *People v. Stowe*, 2022 IL App (2d) 210296, ¶ 51. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable. *Id.*

¶ 23    K.S. testified that she spoke with her great-grandmother for about five minutes on her iPad before separately calling 911 on her cell phone. Moreover, although it is not entirely clear from K.S.'s testimony whether D.W. had left the house when K.S. called 911, the recording suggests that he had not. Thus, given that D.W. was still in his room and still vulnerable to harm during the 911 call, it is questionable whether K.S.'s discussion with her great-grandmother was an "intervening" discussion. It is possible this point was clarified during the hearing on the State's motion *in limine*, to admit the 911 recording. However, the record on appeal does not contain a transcript or other acceptable report of that hearing. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

As appellant, defendant bore the burden of providing a sufficiently complete record of the proceedings in the trial court, and any doubts arising from the absence of such will be resolved against defendant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Lacking a record of the arguments and ruling on a vital aspect of the 911 recording's admissibility, we presume that the court's decision was soundly based in law and fact. See *id.* at 392.

¶ 24 Nor has defendant established that the admission of the 911 recording violated her right of confrontation. It has been observed:

> "The confrontation clause of the sixth amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' [Citation.] In application, the clause provides that '[t]estimonial statements of *witnesses absent from trial*' are barred unless the defendant has had prior opportunity to cross-examine the declarant." (Emphasis added.) *People v. Darr*, 2018 IL App (3d) 150562, ¶ 64 (quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).

Admission of testimonial out-of-court statements does not violate the confrontation clause if (1) the declarant testifies *or* (2) the declarant is unavailable and the defendant previously had an opportunity to cross-examine the declarant. *In re Rolandis G.*, 232 Ill. 2d 13, 24 (2008). "In general, a statement is testimonial if the declarant is acting in a manner analogous to a witness at trial, describing or giving information regarding events that have already occurred." *Id.* at 31. Even assuming, for the sake of argument, that K.S.'s statements on the 911 recording were testimonial, no confrontation-clause violation occurred because she testified at defendant's trial.

¶ 25    Second, defendant argues that the trial court erred in granting the State's motion *in limine* to admit evidence of other acts of domestic violence.  Section 115-7.4 of the Code provides, in pertinent part:

"(a) In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986, or first degree murder or second degree murder when the commission of the offense involves domestic violence, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances."   725 ILCS 5/115-7.4(a), (b) (West 2020).

¶ 26    Section 103(3) of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/103(3) (West 2020)) provides that "domestic violence" means "abuse" as defined in section 103(1) of the Act (*id.* § 103(1)).  Section 103(1) defines "abuse" in pertinent part as "physical abuse [or] harassment," excepting "reasonable direction of a minor child by a parent or person *in loco parentis*."

¶ 27    Evidence admitted under section 115-7.4 may be considered for any relevant matter, including the defendant's propensity to commit domestic violence offenses.  *People v. Currie*, 2022 IL App (4th) 210598, ¶ 57.

¶ 28    Defendant argues that neither her taking K.S.'s glasses nor her "[g]rabbing [K.S.] by the arm in order to bring her inside of the house" was an act of domestic violence.[3]  We disagree. First, as described by K.S. and D.W., defendant's taking K.S.'s glasses was malicious and constituted harassment.  Second, defendant's pulling K.S. into the house occurred amid threats to "beat" her and D.W., whom Keith was choking while defendant was forcing K.S. into the house. In that context, defendant's act constituted physical abuse.

¶ 29    We also note that, under section 115-7.4, the evidence need bear only a general similarity to the charged offense.  *People v. Heller*, 2017 IL App (4th) 140658, ¶ 44.  Here, the charged and uncharged acts were sufficiently similar in that they showed defendant's propensity for taking abusive disciplinary measures.

¶ 30    Defendant also asserts that the trial court did not give a limiting instruction on the other-acts evidence.  Defendant is incorrect.  The jury was instructed that the other-acts evidence was admitted solely on the issue of defendant's "propensity" and could not be considered on any other issue.  "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them."  *People v. Wilmington*, 2013 IL 112938, ¶ 49.  Nothing in the record suggests that the jury did not follow the court's instruction.

¶ 31    Third, defendant argues that the trial court erred in limiting defense counsel's cross-examination of D.W. and K.S., depriving her of her constitutional right to confront the witnesses against her.  We have recently observed:

---

[3]Although the State's motion *in limine* alleged that defendant also grabbed K.S. by the throat, there was no evidence at trial that defendant grabbed K.S.'s throat.

"A criminal defendant has a constitutional right to confront the witnesses against him, including the right to cross-examine. [Citation.] However, a defendant's right to confront a witness is not absolute [citation], and the trial court may limit cross-examination to prevent irrelevant inquiries or questioning that 'threaten[s] to distract the jury from the actual issues by unduly emphasizing details of a witness'[s] life' [citation]. A trial court has broad discretion to limit the scope of cross-examination, and we will not reverse the court's restriction of cross-examination absent an abuse of discretion resulting in manifest prejudice." *People v. Johnson*, 2023 IL App (2d) 210110, ¶ 29.

Defendant identifies specific instances when lines of questioning were restricted but does not explain how the trial court abused its discretion or cite any authority that the court erred. Such "argument" does not merit appellate review, and we deem it forfeited. See *People v. Campobello*, 348 Ill. App. 3d 619, 633 (2004) ("Mere contentions, without argument or citations of authority, do not merit consideration on appeal." (Internal quotation marks omitted.)); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (contentions must be supported by reasons and citation to authority or will be deemed forfeited).

¶ 32    Fourth, defendant argues that she was deprived of her right to be tried by a jury chosen from a fair cross-section of the community. According to defendant, only 1 of 37 prospective jurors—2.7%—was African American, whereas 6% of Kane County's population is African American. "It is well-settled that the constitution promises that everyone's jury will be drawn from a fair cross-section of the community and that members of a distinctive group in the community will not be systematically excluded from jury service." *People v. Bradley*, 348 Ill. App. 3d 677, 680 (2004). However, the mere fact that, as a matter of pure chance, representation

of a given group in the venire is disproportionately low is insufficient to establish systematic exclusion. *Id.* Accordingly, the argument is meritless.

¶ 33 Finally, defendant argues that the State failed to prove beyond a reasonable doubt that she was guilty of interfering with the reporting of domestic violence. A criminal conviction will not be reversed on appeal unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When the sufficiency of the evidence is challenged, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 34 As pertinent here, "[a] person commits interfering with the reporting of domestic violence when, after having committed an act of domestic violence, he or she knowingly prevents or attempts to prevent the victim of or a witness to the act of domestic violence from calling a 9-1-1 emergency telephone system, ***." 720 ILCS 5/12-3.5(a) (West 2020). Defendant takes issue only with the sufficiency of the evidence to establish that she acted knowingly. She notes that K.S. told her that she was on the phone with her great-grandmother. However, there is no question that, when defendant hung up K.S.'s phone, defendant was aware that the police had been contacted.

¶ 35 When defendant entered K.S.'s room, K.S. was speaking with a 911 operator on her phone and with defendant's grandmother on her iPad. Although defendant testified that she believed that her grandmother had made the 911 call, a rational trier of fact could conclude that defendant would have heard her grandmother's voice coming from the iPad while they were conversing, and would, thus, have inferred that the 911 operator was on K.S.'s cell phone. Based on the verbal exchange

heard on the 911 tape between defendant, K.S., and defendant's grandmother, it is reasonable for a jury to conclude defendant's statement "Did you just call the police?" was directed at K.S.; the statement "Did you have her call the police?" was directed to defendant's grandmother; and the muffled female voice stating, "Yeah, I told her to call 911." was presumably the grandmother's response to defendant. The jury could reasonably conclude from this exchange that defendant knew it was K.S. who was speaking with 911 on her cell phone when defendant hung up the phone. Overall, we cannot say that no rational juror could conclude beyond a reasonable doubt that defendant knowingly disconnected K.S.'s 911 call.

¶ 36                                    III. CONCLUSION

¶ 37    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 38    Affirmed.